In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO.  09-14-00035-CR

_____

MATTHEW LEE HUDSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 221st District Court
Montgomery County, Texas
Trial Cause No. 13-07-06912 CR

## MEMORANDUM OPINION

Matthew Lee Hudson appeals from his third-degree felony conviction for assault on a family member. *See* Tex. Penal Code Ann. § 22.01(a)(1), (b)(2) (West Supp. 2014). The jury found Hudson guilty and assessed punishment at thirty years in prison.[1] Hudson was convicted of assaulting C.C., his girlfriend. In two

_____

[1]Hudson stipulated to the prior conviction of assault on a family member and entered a plea of "not true" to two enhancement allegations. The jury found the two enhancement paragraphs "true."

1

appellate issues, Hudson argues that the evidence was legally and factually insufficient to support his conviction. We affirm the trial court's judgment.

STANDARD OF REVIEW

Legal and factual sufficiency challenges are reviewed under the standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). In reviewing a sufficiency challenge to a conviction in a criminal case, we view all the evidence in the light most favorable to the verdict. *Id.* at 899. Based on the evidence admitted during the trial, together with the reasonable inferences that are available from the evidence, we then determine whether a reasonable factfinder could have found the essential elements of the crime beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). This standard allows the jury to weigh the evidence, to fairly resolve any conflicts in the testimony, and to draw reasonable inferences from the basic facts. *Id.*

ANALYSIS

The State charged Hudson with injuring C.C. by striking her in the head and arm. To prove that a defendant unlawfully assaulted another person, the State must prove, beyond a reasonable doubt, that the defendant intentionally, knowingly, or recklessly caused bodily injury to another. *See* Tex. Penal Code Ann. § 22.01(a)(1). "'Bodily injury' means physical pain, illness, or any impairment of

2

physical condition." *Id.* § 1.07(a)(8) (West Supp. 2014). The Court of Criminal Appeals has explained that "[a]ny physical pain, however minor, will suffice to establish bodily injury." *Garcia v. State*, 367 S.W.3d 683, 688 (Tex. Crim. App. 2012). Although usually a Class A misdemeanor, the offense is elevated to a third-degree felony if it is committed against a person whose relationship with the defendant is described in section 71.0021(b) (dating), 71.003 (family), or 71.005 (household) of the Texas Family Code, and if the defendant has been previously convicted of an assault involving family violence. *See* Tex. Penal Code Ann. § 22.01(b)(2)(A); *see also* Tex. Fam. Code Ann. §§ 71.0021(b), 71.003, 71.005 (West 2014).

J.T., a computer repairman, testified that on June 29, 2013, he responded to a service call at a residence in Magnolia to work on a computer. He arrived at the residence, which was a small apartment-like "cabin house" in the woods, around 6 p.m. C.C. answered the door and J.T. went inside. J.T. went upstairs to a desk where the computer was located. J.T. testified that about five or ten minutes after he started working on the computer, Hudson arrived at the residence. As J.T. worked on the computer, C.C. and Hudson sat on a futon about two feet behind J.T. and "had a few drinks" while they talked with J.T. J.T. testified that he remembered C.C. "being a little intoxicated . . . [and] slurring her words a little

3

bit." Hudson was drinking wine but J.T. did not remember Hudson appearing intoxicated.

According to J.T., he had been working on the computer for forty-five minutes to an hour when C.C. said something that embarrassed Hudson, and C.C. and Hudson began arguing. J.T. testified he heard Hudson yelling, heard a "slap noise[,]" and then C.C.'s wine glass hit the floor. J.T. felt some of the wine from C.C.'s glass splash on the back of his head. Right after the slap, J.T. heard a "little scream" and saw C.C., who appeared to be in pain, sitting on the futon "in the fetal position" and "crying and mumbling words to herself."

Hudson went downstairs and was "yelling, kind of ranting, raving at her[,]" saying, "Look what you made me do[,]" and calling her derogatory names. After a couple of minutes, Hudson went upstairs and walked fast towards C.C. He was saying something to C.C. and looked angry and was gritting his teeth. J.T. explained he thought Hudson was going to hit C.C., and because J.T. was scared, he responded by looking away. He did not see what happened next, but he heard what "sounded kind of like wrestling" and "little yelps or little noises" from C.C. Hudson went back downstairs and J.T. stated he sat "frozen" in the chair. C.C. said to J.T., "You are done, and you can -- probably be best to leave." Although J.T. was not finished working on the computer, he was ready to leave.

4

C.C. went downstairs, and while J.T. was shutting down the computer and gathering his things, he heard wrestling and arguing downstairs. He could hear objects "getting tossed" or "knocked over" and could hear C.C. sounding "distressed" and yelling a few times. J.T. walked downstairs to leave, saw C.C. with her shirt off and in her bra and pants, and went back upstairs because he was afraid of Hudson.

Hudson called J.T. downstairs to pay J.T. for his work on the computer. J.T. swiped the credit card Hudson gave him on a device attached to J.T.'s phone, and J.T. explained that a receipt would be immediately sent to Hudson's phone. C.C. was in the bedroom. Hudson was looking for his phone and kicked the bedroom door down. Hudson went in the bedroom and J.T. heard C.C. say "ow" or "ouch[.]" Hudson returned with his phone and J.T. noticed it was in "alert mode" or "emergency mode" as if 911 had been called. Hudson saw the phone, appeared surprised, and closed the door as J.T. left.

J.T. testified then he heard it "get[] real loud inside the house" like "hitting-a-body noises" while he was walking to his car. He was still scared and called his boss and his best friend while driving home. J.T. explained at trial that as he drove he was "processing" everything and he was contemplating calling law enforcement, but because he assumed C.C. had called 911, he "figured the cops

5

were probably on the way." About thirty or forty minutes after the incident, J.T. decided he would go ahead and call 911.

J.T. identified Hudson at trial. J.T. explained that he regrets not calling 911 sooner and that, since the incident, C.C. has called J.T. and asked him if he had talked to any lawyers, and she was trying to get him to alter his statement. She told J.T. that Hudson only knocked over things but did not actually hit her.

Deputy Aaron Brown testified at trial. On the date of the incident, he was working patrol for the Magnolia Police Department in Montgomery County. Deputy Brown was dispatched to the residence for a welfare check due to a person's report that they had witnessed an assault. Three officers responded. As the officers walked up the long gravel path to the house, they could hear a man and woman yelling.

The front door was more than halfway open and there were damaged household items around the doorway. Brown could see a woman sitting on the bathtub, crying, and bleeding from the nose. The officers announced their presence, and Hudson began yelling at them from the bathroom to go away. Brown could not see Hudson and did not know if he was armed. Brown observed C.C. try to leave the bathroom and Officer Brown heard her say she needed help, but Hudson yelled at her not to move. The officers gave commands for Hudson to come out and he yelled at them to leave. As the officers entered the house, Hudson

6

was making his way into the living room and Brown was able to detain him. According to Brown, the residence "looked like a war zone" with a broken pipe leaking heavy water, a giant hole in the wall, broken lamps, blood, and "[e]verything was just everywhere." Brown did not see any door in the house that had been kicked down.

Brown described C.C. as "very distraught" and smelling of alcohol. Her injuries appeared to be a bloody nose, swelling across the bridge of her nose, a large bump on the back of her neck that was bruised, and scratches. C.C. provided a written statement but denied medical assistance. According to Brown, Hudson did not sustain any visible injuries. Deputy Brown testified that Hudson told him that Hudson and C.C. had been together for seven years. Deputy Brown placed Hudson under arrest for assault.

The jury heard J.T.'s testimony regarding the assault and Deputy Brown's testimony regarding Hudson's arrest. The jury saw photographs of the inside of the residence, of C.C.'s injuries, and of Hudson. The jury also heard the audio recording of J.T.'s 911 call.

In reviewing a case where the issue is whether the evidence is sufficient to support a verdict, we are required to give the factfinder, in this case the jury, deference, so that it can exercise its responsibility to fairly resolve any conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the

7

facts admitted in the case at trial. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We do not substitute our judgment for the factfinder's judgment. *Id.* Viewed in the light most favorable to the verdict, we conclude that a rational jury could have found the essential elements of the offense beyond a reasonable doubt. Issues one and two are overruled. We affirm the trial court's judgment.

      AFFIRMED.

_____

LEANNE JOHNSON
Justice

Submitted on November 4, 2014
Opinion Delivered December 10, 2014
Do Not Publish

Before Kreger, Horton, and Johnson, JJ.